Well, good morning again, Ms. Jansen. You may proceed. Good morning, Your Honors. Today, of course, I represent Bree Wright in the second case before the court this morning. I'd like to focus primarily on restitution. If time permits, then I would talk about the transient housing special condition. Restitution, of course, is a creation of statute. It's not a penalty to the defendant. It's not a reward for the victim. It's restoration purposes, to put the victim back in the position that she would have been in, but for the direct and collateral financial consequences of a crime. And, of course, it's also to ensure that a criminal defendant does not retain any financial benefit from his crime. In this court, of course, the district court ordered $20,000 as a reasonable estimate of harm. And the court said that's not just for the money that he made by being a pimp, but also the harm exceeded the money that he took from her. It's difficult to estimate the harm, but it's certainly a reasonable estimate. The court made no credibility findings. It didn't explain in any way how it determined that the calculation was difficult. It didn't determine or explain in any way why it had concluded that $20,000 was a reasonable estimate. Now, from the outset, your honors, I need to point out to the court an error that I made. The first error, I think our overall argument, of course, is the district court imposed an unreasonable restitution order. I think inherent in that argument, of course, is that the restitution needs to be in compliance with the law. And there is, of course, case law, which I should have brought to the court's attention, that United States v. Howard 759 F. 3rd 886, that restitution must be limited to the specific offense of conviction. And that's, of course, per the Supreme Court's Huey decision in 1990. It cannot include losses from relevant conduct unless the offense of conviction contains an element involving conspiracy elements of the offense or ongoing conduct. And so, of course, the issue that I failed to bring to the court's attention or to more sufficiently argue that I would ask the court to consider in its discretion, regardless of whether you consider it an unasserted argument or a new issue, I do believe you have the discretion to consider it, is that Mr. Wright pled guilty to a single offense of violating Section 1591, the sex trafficking statute. And that was specifically that that occurred on May 2nd of 2018. And, of course, everyone lost sight of that. We lost the trees for the forest in this particular case because everyone was so focused on how much restitution is the case. And even if your honors declined to consider the issue that I have just raised, you know, in this case, I do think that ultimately the restitution award should have been limited to that one occasion of trafficking that Mr. Wright pled guilty to. It should not encompass anything else. But if you decline to consider that and we go further, I think that the case still requires remand for several reasons. First, of course, the district court told us that its award included things other than the money that Mr. Wright took from MV, the minor victim. Counsel, assuming that the court should not have said that, wasn't there still a reasonable estimate that would have supported the $20,000 of restitution just from the crime of conviction? I don't believe there is, Your Honor. And the reason I think that's the case, I think we have a fundamental problem with the quality of the evidence here. Of course, in proving restitution, it's the government that bears the burden to prove that particular amount. And certainly the district court is allowed to make a reasonable estimate. But before we resort to the district court making a reasonable estimate, in a situation like this where the government put forward all sorts of calculations, they put forward this many sex acts potentially occurred, it was this many times per day, MV made a minimum of this much and a maximum of this much, we don't just line all of those things up and throw a dart to pick which one of those items we're going to use for our mathematical formula. And that's part of the problem here is that the district court didn't tell us anything. The government didn't actually make a calculation. It pointed to some things that MV said in her statement to the FBI. It pointed to some things that she said during her live testimony at the sentencing hearing. But MV was hardly a consistent witness. She gave very differing accounts. She said, you know, sometimes I made $80, and sometimes it was $300, and sometimes it was once a day, and, you know, sometimes it was 10 times a day. So when we're looking at a preponderance of the evidence standard, first off, we'll assume the district court found MV credible. But when you find her credible, which of her statements do we rely on? And what really comes to my mind in this situation is when we're doing drug quantity calculations and pre-sentence reports. It is not unusual. We see it every day that cooperators, you know, I bought a quarter to a half an ounce of methamphetamine from the defendant three or four times a week for, you know, six to nine months. We don't automatically go to the highest of those numbers. We don't use nine months instead of six. We go to the lowest of those numbers. That's what the government puts forth. That's what the probation office calculates. And I think that that was incumbent upon the district court in this case. When you have this wildly conflicting testimony from MV, it's not corroborated by any other documents, by any other witnesses in the case, why do we automatically jump to the highest that she says? And if we actually look at her testimony, she testified the least amount of time, if we're looking at the least culpable conduct, once per day. She insisted repeatedly that she didn't see him every day. And once in a while she said she did see Mr. Wright every day, but then she said she actually only saw him every other day. She said $80 was the least amount we have even with a five or a six-month period. And she repeatedly insisted that she made every effort not to give him any money at all. She withheld as much as she could, and she actually said, I didn't give him more than a third of what I made from my prostitution activities. Now, if we actually do the math and do a calculation based on those lower numbers like we would with a drug quantity and pre-sentence report, once a day, every other day for five months, that's 75 acts, $80 per act, we're at $6,000. If she gave Mr. Wright one-third of that sum of money, we're at $2,000. That is a far, far cry from $20,000. And I don't think that the district court even gets to the point where it's allowed to make a reasonable estimate unless it first makes a decision that it's too hard to calculate. But here we have actual numbers to work with. If MD had kept records and came in and she said, I gave Mr. Wright $1,562, I don't think we would be arguing that the district court would err by ordering a $2,000 restitution award. The restitution was reasonably discernible. We can determine that. We don't need to go to ballparking it, and I think that's what the court did. Well, maybe we don't need to go to ballparking it, but if you look at what we've said about restitution generally, we've said that we review it for clear error. Once we're reviewing it for clear error, we say that court only need make a reasonable estimate of the loss and we accord particular deference to the determination because the district court is in a unique position to evaluate the evidence in its totality. Which means that while it is kind of customary in drug cases that we tend to always gravitate towards the low end, it's not necessarily reversible error if we have a judge who says, I think it's in the middle or I think it's on the high end. Because we're still supposed to give that deference. And so I assume your argument here is the judge didn't explain enough for us to give any deference to it because he didn't tell us what it was except saying, gosh, it's really hard to come up with a number here. That's absolutely the case. And, Your Honor, I do think most of the cases where the court does approve of the reasonable estimate, there is some indication that it's particularly hard to determine. It's in a fraud case where we have thousands of documents and there's just no way to really hammer down what happened here. But that's exactly the point, Your Honor. I think you hit the nail on the head. The judge didn't tell us any reason. He didn't say why is it difficult. He didn't say what information. Look at this record. You can tell why it was difficult. The difficulty is just sort of how the evidence laid in. It could be one time a day. It could be ten times a day. It could be every day. It could be every other day. It could be $80. It could be $400. And then there's other evidence in there about the victim having been injured or otherwise harmed in this relationship. And so, I mean, if you're the judge, you're not just bound by it. It's not a disgorgement of profit statute. It's a restitution statute. And so you can look at things like there's psychological harm that may require counseling. There's fear and those things. That's still all part of restitution. It is, Your Honor. But I think that there has to be actual evidence to support that. The government never put on any further evidence. And certainly, yes, I agree with you. On this record, we have maybe it was $80, maybe it was $400. But when the government has that burden, couldn't the government have just asked a few more questions? Couldn't we have clarified that? Couldn't the district court have, sitting there right then, asked empty questions? But at the end of the day, we have no idea how the district court reached this number. We don't know if he relied on the highest end, if he relied on the lowest end, if he just threw a dart at balloons on the wall and picked a particular number. And I think for that reason alone, reverse and remand is warranted. Thank you. Ms. Bruner, when you're ready. We will do respect the math and the citations to the record. That was just done as wrong. And I'd like to do the math for you with the citations to the record. So the government relied on both government exhibits for to its sentencing memorandum, which was an interview that was done with the minor victim. It's important to note that references to what she maybe said earlier to Mr. Wright taking a third of her money, that was done earlier. Earlier in the investigation, she was not cooperative and not willing to be forthcoming until shortly before sentencing. So government exhibit four is an interview done with the victim shortly before the sentencing. And then we also relied on statements made in the sentencing transcript. So when the government is trying to figure out what the greater of the gross income or value to the defendant of the victim's services or labor is under 1593B3, the calculation that the government does in these sex trafficking cases that's generally accepted and I think is accepted in this case is how many times a day was there a commercial sex act? How many days a week? We multiply about how much money each commercial sex act was and then how many weeks did this go on for? Obviously, by the nature of commercial sex acts and sex trafficking, that's going to vary. There's no QuickBooks file here. So how many times a day in her interview? She said up to 10 times a day. On page 15, she said it depended on the day. How many days a week in her interview? She said seven days a week. And then at page 14 of the transcript, she said that it was probably most days of the week. How much money? She said in her interview, $100 to $300. At her transcript, she said $80 to $300 or $400 on page 13. That, by the way, is consistent with how commercial sex acts and the pricing of the various sex acts work. That's not a reflection of her being wishy-washy. How many weeks? It was established that by about October of 2017 until mid-April of 2018, when the defendant was in jail, that's how long the sex trafficking occurred. So let's do the math. The conservative estimate that the government laid out in its sentencing memorandum, which the judge adopted, was let's say how many times a day. She said up to 10. It depends. Let's take half of that, five times a day. She says in her testimony that it was most days. So let's put aside the seven days a week. We're going to say most days a week. That's four days a week. The average amount is $200 if we're on the conservative side. How many weeks? Let's say all of November through all of March. Let's say that's about 20 weeks. That's conservative. When you do the math and you multiply that out, that's $80,000. Now, there was discussion about how much Mr. Wright took from her, and she had various statements about, well, he took the money and she didn't hide it. She said that in her prior interview. She said that she hid money a lot during her testimony. Even if you credit her very initial statement in which she said that he took about a third of the money, which I don't think is the case, and I think it was clear through her testimony and her interview that he took more than that. Even if it's a third, then that third is more than $20,000. So when you do the math, Your Honors, then I think it's clear that it's not clear error here for the justice judge to have awarded $20,000 to the victim in this case. Just to address a couple other points that were made by the appellant, that there was discussion about, well, we should always go to the low end, and it should always be at the low end, and you should look at this like a drug case. In this case, that doesn't make sense. In sex trafficking cases, that doesn't make sense. The nature of how victims are controlled by the defendants, the relationship, so in this case, the minor victim, it was undisputed she had a romantic relationship with the defendant beginning when she was 16 years old. There was evidence that he was physically violent to her, that she would give him money because she rationalized it, that she was going to support him. She clearly still loved him. Part of the reason this is a clear error review, and I think that the court should defer to the district judge, is because he could look at her testimony, look at her demeanor. He could see that the courtroom was full of people that were supporting him. Many times in her testimony, she talked about how she was really upset because people were thinking she was a snitch. She talked about how this had been very personally difficult for her, on page 18, I went to ask how she felt about Mr. Wright. She said she was disappointed. She wasn't disappointed because he had hit her, that he had threatened her, that he had put her in this situation. She was disappointed, quote, because of the way that he made it seem like I was telling on him about something that I didn't know about. And then she goes on to say, I don't know how to say it. I don't know. So she didn't want to be there. She didn't want to do that. It was clearly very difficult for her to give that testimony. And so I think that it is fair for the district court to also consider the statements that she had made to law enforcement prior to her testimony when she wasn't sitting there staring directly at Mr. Wright. But even if we just take the conservative estimate based off of what she said at the sentencing hearing, we're still way above the $20,000 that was awarded. And I think for the supervised release questions, we can rely on our brief. It is an abuse of discretion. He pled to being a child sex trafficker, and this occurred in hotels. Counsel, what about the restriction on him having contact with his own minor children? So the condition is really just that he has to get prior approval. When you look at United States v. Hobbs, 710F3D850 in the Eighth Circuit that we cited to, in that case they discuss how, in other cases, the court have upheld conditions requiring preapproval before conduct with the children. Mr. Wright, none of his children resided with him, and I think he was going to have nine children. He had a sexual relationship with a 15-year-old that had produced a child. He had a sexual relationship with this girl when she was starting to be 16. He had an admitted substance abuse problem. So there were concerns about dangerousness to his own children. And, again, it's just prior approval. So it's not saying that he can never be with his children. And similar to the condition about hotels, he just has to get preapproval. And there's no reason that I – there is nothing to suggest that that would be an undue restriction on his liberty in this case. So if there are no other questions, I rely on my memorandum. Thank you. Thank you. Ms. Jansen, I know that you used all of your time, but mostly because I was asking questions. So I'll give you a minute to rebut. Well, I would, of course, invite the court to do the math for yourselves. You can read these statements. I would make the point, of course, that the earlier statement that the government points to, those were not envy words. That was a recitation by an officer that interviewed her. This occurred six months after the incident. The government made kind of a point of, you know, she said only one-third at that particular time, and then she testified differently at the sentencing hearing. The question at the sentencing hearing, did you give him money after most every date? No, I only gave it to him when he needed it. Are there times you hid money from him? Yeah, a lot. Why would you hide money? I didn't want him to have it. Would he sometimes go through your things and take your money when he felt like it? I don't know that that's really stepping away from one-third. And, again, at the end of the day, you know, the government has put forth a lot of information about, you know, the victim was scared and she was in a courtroom. Well, that's all fine. But I don't think we need the government to tell us that. I think we need the district court to tell us that. And here we just have no information that really subjects this case in a restitutional word to meaningful appellate review. Thank you. Thank you, Your Honors.